IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| MITCHELL WILLIAMS, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL CLARK, PAUL ENNIS, EARL JONES, JERI SMOCK, MICHAEL EDWARDS, DANIEL STROUP, DORINA VARNER, KERRI MOORE, DR. JOSE BOGGIO, DR. REKHA HALLIGAN, DR. ANTHONY MICHAEL LETIZIO, ALEXIS SECARA, KURT SUESSER, JOHN STRAMAT, AMANDA HARTWELL, LUKE VOGAN, GLORIA GIBBS, <br><br> Defendants | 1:18-CV-00315-RAL <br><br> RICHARD A. LANZILLO <br> UNITED STATES MAGISTRATE JUDGE <br><br> MEMORANDUM OPINION ON DEFENDANTS' TWO MOTIONS FOR SUMMARY JUDGMENT <br><br> ECF Nos. 128, 134 |

MEMORANDUM OPINION

I.   Introduction

Plaintiff Mitchell Williams (Williams) is an inmate in the custody of the Pennsylvania Department of Corrections (DOC) at its State Correctional Institution at Albion (SCI-Albion). Representing himself, he filed this civil rights action against seventeen individuals who are employed by the DOC or provide medical services at SCI-Albion. Williams claims that the Defendants were deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment and that some of the Defendants retaliated against him in violation of his rights under the First Amendment. He seeks redress of these alleged violations pursuant to 42 U.S.C. § 1983.[1]

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636. ECF Nos. 5, 25, 38.

1

Presently before the Court are two motions for summary judgment. One motion was filed by former SCI-Albion Medical Director John Stramat, current SCI-Albion Medical Director Amanda Hartwell, former SCI-Albion Medical Director Jose Boggio, former SCI-Albion Medical Director Rekha Halligan, former SCI-Albion Medical Director, Michael Letizio, Physician Assistant Daniel Stroup, and Physician Assistant Alexis Secara (collectively, the "Medical Defendants"). ECF No. 128. The other motion was filed by Unit Manager Paul Ennis, Nurse Michael Edwards, Corrections Healthcare Administrator (CHCA) Jeri Smock, Unit Manager Kurt Suesser, Nurse Luke Vogan, and Nurse Gloria Gibbs (collectively, the "Corrections Defendants"). ECF No. 134. For the following reasons, the motions will be GRANTED.

II.     Procedural Posture[2]

Williams's Supplemental Complaint is the operative pleading before the Court. *See* ECF No. 79. The pleadings are closed, and discovery is complete. The Medical Defendants and Corrections Defendants have filed separate concise statements of material fact, and Williams has filed a responsive concise statement of material facts. *See* ECF Nos. 129, 136, 156. The motions have been fully briefed and are ripe for disposition. *See* ECF Nos. 128, 130, 134, 135, 157, 158, 164.

---

[2] The Court previously dismissed the claims against five of the defendants, Clark, Ennis, Jones, Varner, and Moore, on Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6). *See* ECF No. 62. Although the Court's Order granted Williams leave to file an amended complaint as to these claims, Williams did not do so within the prescribed time. Accordingly, the Court dismissed these claims with prejudice and terminated Clark, Ennis, Jones, Varner, and Moore as defendants. ECF No. 69. Williams then filed a motion for leave to file a supplemental complaint with exhibits under Fed. R. Civ. P. 15(d) to allege matters that had occurred after the filing of his original complaint. *See* ECF Nos. 72, 75. The Court granted this motion. *See* ECF No. 79.

2

III. Standard of Review

A. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the Court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories, or other record evidence to demonstrate specific material facts that give rise to a

3

genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party may also rely on the lack of evidence to support an essential element of the opposing party's claim as a basis for the entry of summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

When considering a motion in a *pro se* plaintiff's case, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran's Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999). On a motion for summary judgment, however, "a pro se plaintiff is not relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted). Put another way, just because a non-moving party is proceeding *pro se*, he is not relieved of their "obligation under Rule 56(c) to produce evidence that raises a genuine issue of material fact." *Id.* (quoting *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)); *see also Winfield v. Mazurkiewicz*, 2012 WL 4343176, at *1 (W.D. Pa. Sept. 21, 2012).

The Court also may consider certain evidentiary materials in the record beyond the parties' concise statements and responses. *See Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 661 (W.D. Pa. 2019) ("rely[ing] on the record as a whole to determine the applicable material facts"). *See also King v. Pennsylvania Dep't of Corr.*, 2020 WL 2897019, at *1 (W.D. Pa. June 1, 2020). For example, the Court may consider factual statements in Williams' verified Complaint, but only to the extent they are based upon his personal knowledge. *Jackson v. Armel*, 2020 WL 2104748, at *5 (W.D. Pa. May 1, 2020) (citing *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985)

(treating verified complaint as an affidavit on summary judgment motion)). *See also Brooks v. Kyler*, 204 F.3d 102, 108 n.7 (3d Cir. 2000) (noting that an affidavit is "about the best that can be expected from [a pro se prisoner] at the summary judgment phase of the proceedings"); *Boomer v. Lewis*, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").

IV.   Analysis

   A. Williams' Allegations

Williams' Supplemental Complaint alleged generally that the Defendants provided inadequate care in response to his complaints of back pain, muscle spasms, and associated falls which began in March 2016. ECF No. 79, ¶¶ 54–73. Specifically, in support of this claim, he alleged:

- PA Secara, Dr. Boggio, Nurse Edwards, CHCA Smock, and other Defendants failed to provide medications and medical tests that he requested. *Id.*

- Dr. Halligan, PA Stroup, and other Defendants denied him use of a cane and wheelchair at various times. *Id.*, ¶¶ 61, 63, 68.

- Dr. Letizio and other Defendants failed to follow the recommendation of an outside neurologist to whom he was referred by prison officials. *Id.*, ¶ 62.

- Nurse Vogan "intentionally" burned him on his back with a heating pad and that Dr. Stramat and other Defendants provided inadequate care following this injury. *Id.*, ¶¶ 57, 64–67.

5

- Certain acts taken during the course of his treatment by Gibbs, Ennis, and Suesser were retaliatory, not medically-based decisions. *Id.*, ¶¶ 81–85.

In support of his retaliation claim, Williams' Supplemental Complaint alleged the following:

- Hartwell denied him use of his cane and wheelchair as acts of retaliation. *Id.*, ¶ 80.
- Nurse Vogan burned his back with a heating pad "in retaliation to the Plaintiff constantly going to Medical for his back injury," and that other Defendants were complicit in this retaliation because they failed to do anything when Williams informed them of what happened. *Id.*, ¶¶ 74–79.

As discussed below, the record in this case supports neither an Eighth Amendment deliberate indifference claim nor a First Amendment retaliation claim.

B. Williams' Deliberate Indifference Claim

1. Standard

Deliberate indifference to a prisoner's serious medical need involves the "unnecessary and wanton infliction of pain" and violates the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A plaintiff may show deliberate indifference when a defendant intentionally refuses to provide care, delays medical treatment for non-medical reasons, denies prescribed medical treatment, or refuses reasonable requests for treatment that result in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). Deliberate indifference can also be shown when prison medical personnel

continue with "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

A "critical distinction" exists between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson v. Prison Health Service*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of scienter can be proven through circumstantial evidence and witness testimony. *Id*. But "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id*. (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). "Mere disagreement as to the proper medical treatment [does not] support a claim of an [E]ighth [A]mendment violation." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) (explaining that deliberate indifference requires something "more than negligence").

2. Williams' Medical Care

For purposes of the pending motions, the Court will assume that Williams had a serious medical need and focus on whether the record could support a reasonable jury's finding that any Defendants was deliberately indifferent to that need.

    a. Evaluations and Consultations with Prison and Outside Medical Personnel

Williams first presented with complaints of back pain on or around March 8, 2016, when he was seen by PA Stroup. ECF No. 128-2, p. 756 (Exhibit A).[3] He reported that he had started to feel pain a couple of days after he had performed weighted squats two weeks earlier. Stroup examined him, evaluated his range of motion, and prescribed Mobic, a non-steroidal anti-inflammatory drug (NSAID). PA Stroup's assessment was right facet arthropathy—an arthritic condition of the spine's facet joints.

On October 4, 2016, PA Secara discontinued Mobic because of its side-effects and told Williams that he could get aspirin or ibuprofen from the commissary. On May 24, 2017, CRNP Chuzie prescribed Williams ibuprofen for his pain. On June 6, 2017, PA Secara assessed Williams, prescribed naproxen, and ordered an x-ray "involving sacroiliac joint with weight bearing," which was performed that same day. *Id.*, pp. 746, 753-54. PA Secara reviewed the x-ray with Williams on June 27, 2019. PA Secara also assessed Williams on that date. She prescribed NSAIDs and instructed him to stretch. *Id.*, p. 752. On August 15, 2017, at a follow-up appointment for his pain, CRNP Chuzie continued his naproxen prescription, directed that he avoid lifting weights, and instructed that he perform stretches and use a warm compress.

---

[3] The pagination of Williams' medical records in the Medical Defendants' Exhibit A begins at ECF No. 128-2 and continues sequentially to ECF No. 128-3. The Court will follow the Defendants' citation method and treat Exhibit A as if it was entirely at ECF No. 128-2.

8

Williams was again instructed to stretch and use a warm compress at a follow-up appointment on August 23, 2017. His medical records continue much like this for some time. Williams would present to medical staff with back pain, leg pain, or chest pain, and related symptoms such as numbness. Medical staff would examine Williams, diagnose his condition, and prescribe medication and treatment.

Dr. Hartwell and other medical professionals performed or prescribed extensive diagnostic tests, including a variety of lab work, to assess Williams' condition. *See id.*, pp. 128–31, 310–13, passim). Since March of 2016 when he first presented with back pain, ten x-ray studies have been performed on Williams. Williams reported that he had fallen on several occasions. On each such occasion except four, x-rays were taken to evaluate him for possible injury. On one occasion when x-rays were not taken, medical personnel noted that Williams had experienced a guided fall and did not hit anything.

On eight occasions, prison medical personnel arranged for Williams to consult with outside neurologists and neurosurgeons who reviewed Williams' history, assessed his condition, and reviewed the results of various body scans and neurological tests. These scans and tests included two magnetic resonance imaging (MRI) scans, one computed tomography (CT) scan, one electromyography (EMG), and one electrocardiogram (ECG/EKG). On March 9, 2018, Dr. Halligan referred Williams to Allegheny Health Network Teleneurology for an evaluation. *Id.*, pp. 672, 784. Williams was seen by Dr. Kevin Kelly on April 4, 2018. Dr. Kelly assessed Williams for concerns that his low back pain and lower extremity muscle spasms were an early indication of a neuromuscular disorder. *Id.*, pp. 737-38. Dr. Kelly's assessment was that Williams' symptoms did not explain his purported inability to stand or walk. The plan was to perform and then review an MRI. He recommended physical therapy and directed Williams to

avoid using the wheelchair as much as possible. *Id.* Thereafter, the results of a lumbar spine MRI performed at Meadville Medical Center on April 17, 2018 showed "broad-based central disc protrusion/herniation at the L4-L5 level." *Id.*, p. 370. On May 8, 2018, Williams was evaluated by Dr. Salem El-Zuway at Great Lakes Neurosurgery. Dr. El-Zuway reviewed Williams' MRI results and identified "degenerative disc disease L4-L5 with bilateral foraminal stenosis as well as right leg radicular pain and paresthesia." *Id.*, pp. 782, 790–93. He recommended "conservative measures including pain injections, followed by physical therapy...for three to six months," after which time he could return to discuss a possible neurosurgical intervention. *Id.*

Williams underwent physical therapy at SCI-Albion (summarized below), and Dr. Letizio at SCI-Albion scheduled him for another outside neurological appointment with Dr. El-Zuway at Great Lake Neurosurgery on August 14, 2018. *Id.*, pp. 775, 794–98. Dr. El-Zuway's assessment was that Williams had a weak spine, that he had sciatica, and right leg weakness. He recommended "further workup of his current symptoms, as neurosurgery was not convinced his findings on MRI lumber spine explain all symptoms." The recommendation was to rule out all other conditions first. Williams then continued physical therapy at SCI-Albion (summarized below). Some months later, Dr. Hartwell placed another request for a neurology consultation, *id.*, p. 770, which took place on December 3, 2018 with Dr. Erica Grazioli at UPMC-Hamot Medical Center. *Id.*, pp. 575, 770. There, Williams underwent an EMG study—specifically "EMG nerve conduction"—which was negative for any "electrodiagnostic evidence for a right lower extremity radiculopathy, plexopathy, or mononeuropathy." *Id.*, pp. 575, 770. The "studies of the lower extremity, including proximal conductions, were normal." The "needle electrode examination of right lower extremity, including paraspinals, were normal. The conclusion was

there was no electrodiagnostic evidence for a right lower extremity radiculopathy, plexopathy, or mononeuropathy." *Id.*

Four days later, on December 7, 2018, CRNP Hayton requested an appointment for an additional outside neurology opinion, which was approved and scheduled for March 7, 2019. *Id.*, p. 769. On December 26, 2018, Williams was transported to UPMC-Hamot where he underwent computed tomography (CT) scans of his chest, abdomen, pelvis, and head. These scans revealed age-appropriate degenerative changes along his spine (L5-S1) thoracic spine with mild endplate degenerative changes. The scans were otherwise negative on an enhanced scan for relevant information. *Id.*, pp. 729–33. The assessment was chronic lumbar pain with possible right sciatica. The importance of conservative management with physical therapy and pain management were explained to Williams. *Id.*, pp. 362–68.

One of his neurologists—Dr. El-Zuway—recommended another outside neurology appointment to further assess Williams' symptoms. Pursuant to this recommendation, SCI-Albion medical personnel sent him to Dr. Sandra Pinzon at UPMC Northshore Neurology on March 7, 2019. *Id.*, pp. 362–68. Her physical examination revealed normal muscle tone with normal reflexes and her neurological examination showed no evidence of abnormalities. Her assessment was chronic lumbar pain with possible right sciatica. She explained the importance of conservative measures to handle the condition, recommending physical therapy and pain management through medications and other methods. *Id.* Williams then underwent more physical therapy, much of it at SCI-Laurel Highlands (see below). One month after his appointment at UPMC Northshore Neurology, he had a follow-up neurology appointment where the recommendation again was physical therapy and pain management. *Id.*, p. 766. Also, on April 4, 2019, Williams underwent an electrocardiogram (ECG) on his heart. The results were

11

normal. *Id.*, p. 357. About six weeks later, Williams was transported to Somerset Hospital where Dr. Jacob Shipley performed a fluoroscopy guided epidural steroid injection of his lumbar spine to alleviate his pain. *Id.*, pp. 184–86, 195–97, 348–53.

Around this time, outside neurologist Dr. Dancha said that the "[n]ext step is a Neurosurgical evaluation of the low back, since conservative measures have failed." *Id.*, p. 159. Williams was then sent for another MRI at UPMC-Hamot on August 2, 2019. An MRI with contrast of his lumbar spine showed "[m]ultilevel degenerative change with near anatomic alignment. Lateral recess and formal stenosis." *Id.*, pp. 166-67. Dr. El-Zuway reviewed this MRI with him three days later at Great Lake Neurosurgery. *Id.*, pp. 62–64. Dr. El-Zuway did not recommend him for surgery, proposed further pain medication (Gabapentin), and suggested a right sacroliliac joint injection, and noted that no follow-up appointment with neurosurgery was needed. *Id.*, pp. 168-69, 801. None of the neurologists who had seen and evaluated Williams recommended him for surgery.

      b. Summary of Medications and Treatment Modalities

Between 2011 and April of 2020, medical personnel prescribed Williams a variety of medications for pain, including Topamax, naproxen, ibuprofen, Celebrex, Toradol, Mobic, Tylenol Max, Trazodone, Cymbalta, Medrol dose pack, Prednisone, Tylenol 3, Voltaren (Diclofenac), and Motrin. *Id.*, pp. 3-5, passim. Staff often changed his medications and doses in response to his varying pain, symptoms, and drug side effects. Williams was also prescribed medications for other conditions, including alpha blockers and laxatives.

Along with medications, staff also treated his conditions with physical therapy. On October 10, 2017, Pamela Reynolds provided physical therapy to Williams, prescribed a home exercise plan for his shoulder, back, and chest problems, and directed him in sleep posture

changes. *Id.*, pp. 750, 789. Reynolds saw Willaims for a follow-up appointment on December 7, 2017. She noted that his current plan was not providing relief and suggested a referral to an orthopedic physician for his left shoulder and left leg. *Id.*, pp. 750, 759, 761. Dr. Halligan later placed another request for physical therapy on February 12, 2018, *id.*, pp. 685, 787, and he was again seen by Reynolds on March 27, 2018. *Id.*, pp. 748, 757. Williams' neurosurgeon at Great Lakes Neurosurgery recommended physical therapy for three to six months, among other conservative measures, before reevaluation for surgery. *Id.*, pp. 782, 790–93. On May 9, 2018, Letizio placed a request for physical therapy exercises Williams could do himself in the prison's gym, and it was later noted that the plan was for Williams to have three to six months of physical therapy at SCI-Albion. *Id.*, pp. 778. Between June 5, 2018, and October 23, 2018, Reynolds saw Williams for physical therapy at least four times, and she also gave him home exercises to perform. *Id.*, pp. 748, 773, 777. Dr. Stramat noted in his chart that by November 1, 2018, Williams had completed his current course of physical therapy. *Id.*, pp. 630-31.

On March 20, 2019, after outside consultations with neurologists, Dr. Hartwell instituted a plan, consistent with the neurologists' recommendations, to place Williams in an aggressive physical therapy program to work on strengthening and mobility for his low back pain. *Id.*, pp. 461-62, 768. This physical therapy plan required transferring Williams to different prison that was better equipped to accommodate the program. *Id.* At an outside neurology appointment on April 7, 2019, it was reiterated that the recommendation was physical therapy and pain management, and, if there was no improvement, Williams could return for further consultation. *Id.*, pp. 765-66. On April 10, 2019, Williams was transferred to SCI-Laurel Highlands where he remained in the infirmary for several weeks and underwent physical therapy three days a week for five weeks. *Id.*, pp. 200-02, 213-266, 358, 768. At the end of his time at SCI-Laurel

13

Highlands, Dr. Dancha noted, "Inmate still sitting in wheelchair with *minimal participation* in physical therapy or *hardly any attempts on the block to ambulate with a walker*. Inmate complains of spasms in feet." *Id.*, pp. 159 (emphasis added).

In addition to this battery of diagnostic testing and treatments, Williams was admitted to the infirmary under the care and observation of medical staff for a total of 179 days between March of 2016 and April 1, 2020, including 64 days at SCI-Laurel Highlands (April 10, 2019 to June 13, 2019) where he received his extensive physical therapy, *id.*, pp. 213–266, and 14 days in the infirmary at SCI-Greene, where he temporarily stayed for care from July 4, 2019, until July 18, 2019. *Id.*, pp. 73–76, 116-17, 126. In Williams' records, staff at SCI-Greene repeatedly noted that Williams displayed a lack of effort in his therapy, including comments such as he "acts like he is unable to do things especially when female staff members are around." *Id.*, pp. 106–08. Dr. Hartwell made similar observations upon his return to SCI-Albion, and she and some nurses noted that while Williams claimed to experience muscle spasms and leg shaking, he did not suffer these conditions when observed outside the company of medical staff.

After Williams was released from the infirmary, he sought medical care far less frequently. On November 20, 2019, CRNP Hayton met with Williams to ask why he was not submitting sick calls as had been his past practice. *Id.*, pp. 26-27. Williams responded, "I don't put sick call or request slips in, I saw the neurosurgeon in August and there is a treatment plan that should be followed." *Id.*

The most recent entry in the medical records that are available to the Court is from April 1, 2020. This entry noted that multiple options remained available to Williams for pain management, including previous medications that had not been utilized at their full dosage or in combination with other medications and treatments to mitigate side effects. *Id.*, pp. 3-5. It was

also noted that Williams needed further education on realistic expectations about pain. *Id.* The record also noted that he "may benefit from CBT [cognitive behavioral therapy] or operant therapy." *Id.*

    3. The record does not support a finding that any Defendant acted with deliberate indifference to Williams' serious medical needs.

Despite the extensive assessment, treatment, and therapy Williams received from a broad array of prison and outside medical professionals, he remains unsatisfied with the quality and results of his care. While unfortunate, "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). At best, Williams' claim amounts to a mere difference of opinion regarding his medical care, which likewise does not support a claim. *See id.*; *Turner v. Corr. Med. Serv.*, 2003 WL 23112272, at *3 (D. Del. Dec. 18, 2003) (plaintiff's "extensive medical records" confirm a course of treatment and, "[w]hile plaintiff may disagree with the course of his treatment as well as the efforts of defendants, such disagreements do not constitute a constitutional violation") (citation omitted).

An inmate's receipt of extensive medical care does not necessarily preclude an Eighth Amendment violation. *See White*, 897 F.2d at 109 (deliberate indifference to exercise "persistent conduct in the face of resultant pain and risk of permanent injury"). But here, the record confirms that the Defendants repeatedly used their medical judgment to adapt the care they were providing to Williams and, when appropriate, they utilized outside diagnostic testing and medical specialists to assess and treat Williams.

Williams also contends that the Defendants' denial of his wheelchair was an act of deliberate indifference. But his medical records show that this was done for legitimate medical

15

reasons. Dr. Hartwell wanted Williams to ambulate more using his walker so that he would build back his strength. *Id.*, pp. 537-38. Williams' wheelchair was taken on March 8, 2019, and he remained in the infirmary under close observation by various medical personnel from then until April 10, 2019. *Id.*, pp. 280–327; 460–538. After Williams struggled to walk effectively with the walker for a period, CHCA Smock again approved Williams for a wheelchair. *Id.*, pp. 359–61. Upon Williams' release from the SCI-Albion infirmary on April 10, 2019, he was transferred to the SCI-Laurel Highlands' infirmary for aggressive daily physical therapy. *Id.*, pp. 213–266. Because Williams' wheelchair was removed for a medical purpose pursuant to the Dr. Hartwell's medical judgment, this action does not support a finding of deliberate indifference. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Williams' assertions that that Nurse Vogan "intentionally" burned him on his back with a heating pad and that other Defendants were complicit by responding inadequately are also without evidentiary support. ECF No. 79, ¶¶ 57, 64–67. Williams' medical records document that heat was one of the treatments prescribed for his conditions. Although Williams was found to have a quarter-sized superficial wound on his lower back, his medical records do not support that he sustained this or any other injury because of his heating pad or heating pack treatment. *See* ECF No. 128-2, pp. 592–618. Even if he had sustained some injury, the record does not support that Vogan inflicted it intentionally or that it was sufficiently severe to support an Eighth Amendment claim. Viewing the record in the light most favorable to Williams, no rational jury could find that any Defendants acted with deliberate indifference to his medical need. *See, e.g.*, *Kokinda v. Pennsylvania Dep't of Corr.*, 797 Fed. Appx. 69, 71 (3d Cir. 2019). Accordingly,

summary judgment will be entered in favor the Defendants on Williams's Eighth Amendment claim.[4]

### 4. The Affirmative Defense of Failure to Exhaust Administrative Remedies

The Corrections Defendants argue that they are entitled to summary judgment on Williams' retaliation claim because he did not exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). ECF No. 135, pp. 5, 11. The Court is obliged to address the exhaustion defense as "a threshold requirement." *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304-05 (3d Cir. 2020) (citations omitted). Because the Corrections Defendants have failed to produce an appropriate record to support their exhaustion defense, summary judgment cannot be granted on that basis.

The PLRA mandates that prisoners exhaust all available administrative remedies before bringing a lawsuit concerning conditions of their confinement. 42 U.S.C. § 1997e(a). This requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence. *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L.Ed.2d 12 (2002). The plaintiff's failure to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L.Ed.2d 798 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

To establish the plaintiff's failure to exhaust administrative remedies at the summary judgment stage, the moving party must produce a record demonstrating his entitlement to

---

[4] Williams original complaint also included a Fourteenth Amendment claim based on his medical care. *See* ECF No. 3, p. 1. His Supplemental Complaint omitted this claim. In any case, the explicit source doctrine would bar a Fourteenth Amendment claim in this case because "[t]he Eighth Amendment provides the explicit source of constitutional protection against deliberate indifference to serious medical needs." *In v. Stroup*, 2020 WL 5819602, at *9 (W.D. Pa. Sept. 30, 2020) (citing *Albright v. Oliver*, 510 U.S. 266 (1994).

17

judgment on the defense as a matter of law. Fed. R. Civ. P. 56(c)(1)(A). Typically, the most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record. *See, e.g., Green v. Maxa*, 2019 WL 1207535, at *6 (W.D. Pa. Mar. 14, 2019); *Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016). Where the plaintiff misses a step in the grievance process, however, the defendant should provide an affidavit from a person with knowledge or a properly authenticated business record affirming factually that the plaintiff failed to properly exhaust. *See* Fed. R. Civ. P. 56(c)(4). This is often an affidavit from a records custodian. *See Wiggins v. Correct Care Solutions, LLC*, 2017 WL 11550519, at *5, *7-8 (E.D. Pa. May 9, 2017); *Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); *accord Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review"). The current record is inadequate to determine whether Williams exhausted his retaliation claims. The Corrections Defendants have not produced an affidavit or business record attesting to the completeness of the relevant grievance and appeal records produced to the Court. Therefore, summary judgment on this basis will be denied.

    5.   Williams' retaliation claim nevertheless fails on the merits.

Having rejected the Corrections Defendants' request for summary judgment on Williams' retaliation claim based on their exhaustion defense, the Court will consider whether the record is sufficient to sustain the claim on the merits. To establish illegal retaliation for engaging in protected conduct, a plaintiff must demonstrate that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*,

241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Even where direct evidence of retaliatory motive is absent, such motive can be inferred from: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Williams identifies his requests for medical care as the constitutionally protected conduct upon which he bases his retaliation claim. Because he is entitled to medical care for his serious medical needs, Williams has supported the first element of his retaliation claim. *See Oxendine v. Bryan*, 2020 WL 5702524, at *6 (M.D. Tenn. Sept. 24, 2020) (slip copy) (quoting *Lumbard v. Lillywhite*, 815 Fed. Appx. 826, 834 (6th Cir. 2020)). The claim fails, however, based on the absence of evidence to support the adverse action and causation elements. As adverse actions, Williams points to the multitude of medical decisions he claimed to be inadequate or with which he disagreed. As discussed at length, these decisions represented legitimate exercises of medical judgment. His disagreement with them does not convert them to "adverse actions" for purposes of his retaliation claim. Williams has also failed to produce evidence to show that any medical decision or action was retaliatory for his frequency of seeking care rather than an effort to address his complaints and conditions. "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda or oral argument." *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Williams has failed to "put up" in support of his retaliation claim. The Defendants are therefore entitled to judgment as a matter of law on this claim.

6. Conclusion

For the foregoing reasons, the motions for summary judgment at ECF Nos. 128 and 134 will be granted and judgment entered in favor of Defendants. An appropriate order follows.

DATED this 20th day of December, 2021.

BY THE COURT:

_____
RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE